SUMNER and others *v.* CASWELL and others.

*(District Court, S. D. New York. May 9, 1884.)*

1. COMMON CARRIER—PARTICULAR VOYAGE—CHARTER-PARTY—BILL OF LADING.
    Where a ship is chartered to carry the goods of a single freighter only upon a particular voyage, *semble*, she is not a common carrier, but is subject only to the express and implied obligations of the charter-party and bill of lading.

2. SAME—WARRANTY—SEAWORTHINESS.
    The implied terms of such a charter, and the ordinary bills of lading given in pursuance of it, as well as the covenant in the charter that the ship shall be "tight, stanch, strong, and every way fitted for the voyage," include an implied warranty of the seaworthiness of the vessel at the time she sails for the particular voyage, and in respect to the cargo laden on board.

3. SAME—BALLAST.
    The proper ballasting of the ship, and the amount and arrangement of the cargo so as to make her sufficiently steady, are included in seaworthiness.

4. SAME—JETTISON—LIMITED LIABILITY—REV. ST. § 4213—PENDING FREIGHT—AMENDMENT.
    Where the libelants agreed to take a cargo of petroleum in low-top 10-gallon cases from Philadelphia to Japan, and the owners superintended the loading

and ballasting of the ship, and determined the amount of cargo they would receive, and on starting from Philadelphia the ship was found unsteady, and, immediately on getting to sea, showed great crankness, so that, notwithstanding all efforts to diminish it, the ship, on the fourteenth day out, in a storm of no unusual character, was nearly on her beam ends, and it was found necessary to jettison 3,000 of the cases, *held*, that the jettison was made necessary, not by perils of the seas, but because the ship was top-heavy from want of sufficient ballast in connection with the loading, and that these defects were at the risk of the ship-owners, and within their express and implied warranty of seaworthiness. *Held, therefore*, that the ship-owners were liable on their bond given in this proceeding to limit their liability for the loss by jettison. *Held, further*, that section 4283, Rev. St., requires the surrender of pending freight, which includes, at least, the freight earned up to the time of the loss; and liberty was given to the libelants to amend their proceedings by paying the amount of such freight into court, or giving a further bond therefor.

This libel was filed by the owners of the ship Castine to limit their liability under sections 4283, 4284, of the Revised Statutes. At the same time they contest their liability. The ship was chartered by a contract of affreightment, to carry a "full and complete cargo of refined petroleum in the customary low-top, ten-gallon cases, at forty-seven and a half cents per case," from Philadelphia to Yokohama, Hiogo, or Nagasaki, Japan. On the part of the owners, the charter-party provided that the vessel should be "tight, stanch, strong, and every way fitted for such voyage, and to receive on board the said merchandise." She was loaded at Philadelphia under the direction of the owners, and 37,000 cases put on board. She left Philadelphia on the twenty-eighth day of November, 1878. From the first it was perceived that she was unsteady. On getting out to sea she was found to be quite crank, which increased with rough weather. On the fourteenth day out, in a storm, she was nearly on her beam ends; and two days after it was found necessary to jettison 3,000 cases, of the value of about $13,000. The necessity of the jettison is not disputed, and everything was done by the captain that could be done to avert it. She subsequently reached Hiogo with the remainder of the cargo. A claim being made on the owners of the cargo jettisoned, on the ground that the ship was unseaworthy and top-heavy for the want of sufficient ballast, and the loss being greater than the value of the ship, the owners filed this libel to limit their liability as above stated, and have bonded the vessel in the sum of $10,000; while they contest their liability for any damage, alleging that there was no fault or want of care on their part to cause the loss.

*Scudder & Carter* and *Geo. A. Black*, for libelants.

*Treadwell Cleveland*, for respondents.

BROWN, J. The libelants have proved, so far as affirmative testimony in such cases can prove, that there was no intentional failure in any respect to make the ship seaworthy by means of proper loading, stowage, dunnage, and the use of all the ballast which, from the previous trips of the ship, they supposed would be required. The ship had not carried petroleum in cases before; but she had carried it in

barrels, which would seem to be not less compact and steady than the cases; and 90 tons of ballast were used, which was all that had been before found necessary. On the ground that they used all such care and diligence as could reasonably have been expected in the stowage and ballasting of the ship, the owners insist that no liability attaches to them; contending that, under a charter of the character described, they are not responsible as common carriers, but only for reasonable diligence as bailees for hire.

The charter appears to have contemplated carrying the goods of the freighters only. She was in no sense, therefore, a general ship; but only a ship hired for a specific voyage, to carry a particular cargo for the charterers. Such a contract does not seem to be within the definition of a common carrier. In the case of *The Niagara* v. *Cordes*, 21 How. 7, a common carrier is defined as "one who undertakes for hire to transport the goods of those who may choose to employ him from place to place. He is, in general, bound to take the goods of all who offer, unless his complement for the trip is full, or the goods be of such a kind as to be liable to extraordinary danger, or such as he is unaccustomed to convey." None of these conditions attach to a contract of affreightment in charter-parties like the present. In *Lamb* v. *Parkman*, 1 Spr. 353, it is stated by SPRAGUE, J., that such contracts "are not those of a common carrier, but of bailees for hire, bound to the use of ordinary care and skill." And such is the view taken in Pars. Shipp. & Adm. vol. 1, pp. 245, 248. The most recent discussion of the subject is in the case of *Nugent* v. *Smith*, 1 C. P. Div. 19, in which a liability like that of a common carrier was upheld by BRETT, J., but was subsequently overruled in the court of appeal by COCKBURN, C. J. 1 C. P. Div. 423, (1876.)

It is not necessary, however, to pursue this inquiry further, as the liability of the ship-owners in this case does not seem to me to rest upon this distinction, but rather upon the provisions of the charter itself. I can have no doubt from the testimony that the jettison was made necessary mainly, if not wholly, in consequence of the ship's being top-heavy through the want of sufficient ballast. She was not, probably, too deeply loaded, had there been sufficient ballast at the bottom. A suggestion is made of insufficient dunnage; but it is not clear how this could have contributed to the difficulty. There was some leakage of oil from the time the vessel got to sea, which was shown in all the pumpings. The evidence of the captain, however, is to the effect that this was not an important element in requiring the jettison of part of the cargo. There was some rough weather; one storm was encountered; but the log gives no indication that it was of an extraordinary character, while the entries from the first contain almost daily mention of the great crankness of the ship. I can have no doubt, therefore, that the cause of the loss was not perils of the sea, since no unusual weather was encountered, (*Hubert* v. *Recknagel*, 13 FED. REP.

912,) but the unseaworthiness of the ship, through her mode of lading, in connection with the want of sufficient ballast to prevent her being dangerously top-heavy.

The owners in this case, or their agents, undertook the supervision of the loading of the vessel in person. Mr. Currier, one of the part owners, procured the stevedore and the dunnage; and he determined the amount of ballast to be used. The captain did not arrive until the vessel was loaded and nearly ready to sail. The charter-party provided that the vessel should be in every way fitted for the voyage. This includes the furnishing of necessary ballast, since it is the duty of the owner to find proper ballast for the ship in order to make her trim for the voyage. *Irving* v. *Clegg*, 1 Bing. N. C. 53. The covenant that the ship shall be in every way fitted for such a voyage, in my judgment, covers the proper ballasting of the vessel, as it does her proper equipment in all other respects. The owners must be held legally chargeable with knowledge of the amount of ballast required by their own vessel, and of the cargo they had undertaken to carry. It is not to be supposed that freighters who have no knowledge of the ship or control of the lading, either in the manner of stowage or ballasting, or the amount of cargo to be taken on board, are intended to be charged with the risks of any unseaworthiness occasioned by such causes. It was the clear duty of the owners to take notice, and to know, whether the vessel was in proper trim to proceed to sea. They took such cargo as they saw fit to put aboard; no amount was specified in the charter; it was left at the option of the owners. One of the witnesses says: "The people that loaded the ship ordered the vessel to be loaded, and they ought to know how she should be loaded; it lays with them. They loaded her just as they thought proper; they can fill her half full, or full. Of course, we give them all the cases they want; all that they required."

In taking as many cases as they chose to take, and loading the vessel as they saw fit, the libelants were bound to take so much cargo only, and to stow it in such a manner as that the ship should be fit for such a voyage; and they, and not the shippers, took the risk, therefore, of any imperfect knowledge they may have had, from whatever cause, as to the proper adjustment of the cargo and the amount of ballast to make her seaworthy.

Bills of lading, moreover, in the usual form, in pursuance of a provision to that effect in the charter-party, were given for the goods received on board. Besides the express contract that the vessel should be fitted for the voyage, there was also the warranty implied by law under the bills of lading, as well as incident to the charter and a part of every such contract, that the ship, at the time she sailed, was in all respects seaworthy, and fit and competent for the sort of cargo and the particular service for which she was engaged. 3 Kent, *205; Macl. Shipp. 406; *Work* v. *Leathers*, 97 U. S. 379; *The Rebecca*, 1

Ware, 192; *The Titania,* 19 Fed. Rep. 101, 107; *The Lizzie W. Virden,* 19 Blatchf. 340; S. C. 11 Fed. Rep. 903; *Cohn* v. *Davidson,* 2 Q. B. Div. 455.

The two cases last cited are not, in principle, distinguishable from the present. In both cases the vessel sailed under a charter. In the former, almonds were injured by the fumes of petroleum carried upon a former voyage. Blatchford, J., says, (p. 344:) "The owner's contract, in this case, was to provide a vessel fit to carry this cargo. She was not fit. The shipper took no risks but the perils of the sea, and the damage in this case was not a peril of the sea." At page 354 he says, again: "The ship-owners, not the charterers, took, under this contract, the risk of the condition of the vessel,—the risk of there not being heat and steam, and the risk of so cleansing the vessel as to take the cargo safe from petroleum damage, notwithstanding heat and steam." In *Cohn* v. *Davidson,* the ship, though apparently seaworthy when she sailed, foundered at sea from some unknown cause. The ground of the shipper's liability is there fully discussed by the court; and the owners were held liable because, "by the nature of the contract, they impliedly and necessarily warrant that the ship is good, and in a condition to perform the voyage then about to be undertaken, or, in ordinary language, is seaworthy; that is, fit to meet and undergo the perils of the sea and other incidental risks to which she must, of necessity, be exposed in the course of the voyage, (*Kopitoff* v. *Wilson,* 1 Q. B. Div. 380;) and this implied warranty attaches and has reference to all the conditions of the ship at the time she enters upon her voyage."

However unexpected the crankness of this ship may have been, the evidence clearly shows that from the moment she got to sea she was in an unseaworthy condition, and unfit to encounter the ordinary perils of a sea voyage. The jettison was made necessary, not from any unusual stress of weather she met, for there was none such, but from her unseaworthy condition when she sailed.

The libelants must therefore be held responsible for the loss, upon the express as well as implied terms of the contract, as in the cases above cited, and in *Hubert* v. *Recknagel, ut supra,* and the case of *The Regulus,* 18 Fed. Rep. 380. The grounds upon which the case of *The Titania* was decided (19 Fed. Rep. 101, 107) are not applicable here; and in the case of *Lamb* v. *Parkman, supra,* the mode of stowage in no way affected the seaworthiness of the ship, so as to constitute a breach of the express or implied warranty of the charter and bill of lading.

The libelants must therefore be held answerable upon the bond heretofore given in these proceedings.

Section 4283 requires not only the surrender of the ship, but also of the pending freight. No bond has been given on account of any pending freight. These terms must be held to include at least the freight accruing and earned up to the time of the loss. The libel-

ants may amend their proceedings by including the pending freight, and paying the amount into court, or giving bond therefor, in addition to the bond already given. If the proportion of net freight earned up to the time of the loss is not agreed on, a reference may be taken to ascertain it.

The defendant is entitled to the costs of this trial.