## ANDERSON LUMBER CO. v. GREENWICH INS. CO.

(District Court, S. D. New York. February 11, 1897.)

TUG AND TOW—TOP-HEAVY—DUMPING CARGO—INSURERS DISCHARGED.

The barge K., loaded with lumber, while being towed down the narrow channelway from West Duluth, rolled so as to dump her deck cargo partly to starboard and partly to port. On a conflict of testimony, *held*, that the circumstances showed that the barge was top-heavy and not loaded in a safe or seaworthy condition for the contemplated voyage to Tonawanda, and the insurers of the cargo were, therefore, discharged under the terms of the policy.

Hyland & Zabriskie, for libellant.
Butler, Notman, Joline & Mynderse, for respondent.

BROWN, District Judge. The above libel was filed upon a policy of insurance issued by the defendant to recover $1,441.65 for the loss of a part of the deck load of the barge or schooner Knapp at Duluth, between 3 and 4 o'clock in the afternoon of August 22, 1895. The policy permitted a deck load. There were 220,600 feet of lumber in the hold, and 312,900 feet on deck. The load was about 12 feet high on deck, and she drew 12½ feet of water. She was taken in tow on a hawser by the tug Abbott at the upper dock of Merrill and Ring between 2 and 3 p. m. After going down the narrow channel about half a mile, i. e. about a quarter of a mile after passing the second bend, the barge rolled so as to dump a part of her deck load to starboard, and on recovery rolled to port and dumped another portion on the port side. The captain of the barge returned to Duluth and had an interview with Davis & Hunter, the shippers named in the bill of lading, in reference to saving the lumber that had been dumped overboard; but the cargo being covered by insurance, the shippers, conceiving that they should not meddle, refused to give any instructions, and according to the captain's testimony forbade doing anything. This last statement is, however, denied by the shippers. Notice by telegraph was immediately given to the insurers, who gave instructions for saving the lumber; but before anything could be done it was scattered and lost. The lumber was in fact owned by the libellant, a New Jersey corporation, who had bought it from the Cranberry Lumber Company of Duluth through Davis & Hunter, acting as inspectors or brokers; and who, in accordance with the custom at Duluth, after having measured the lumber, shipped it on board the Knapp, and forwarded to the libellant the bill of lading. In strictness, the duties and the legal authority of Davis & Hunter ended from the moment the shipment was completed. The libel alleges that the loss was by a sea peril within the policy. The evidence on the libellant's part tends to show that the dumping of the deck cargo was in consequence of some lack of care in towing the barge too fast down the narrow channel; causing her to roll by touching the bank first on one side and then on the other, or by touching some obstruction in the channel, as the barge

captain says; and finally by running the barge on the port bank, causing the final loss.    The defendant contends that the barge was improperly loaded, so as to be top-heavy and cranky, and that the accident was attributable to this cause; and second, that but a small portion of the loss would have been incurred had proper attention been given to saving the lumber by the shippers, or by the carriers after it was dumped.

It is unnecessary to consider the second defense, as I am satisfied that the barge was top-heavy and cranky from the start, and unfit for the trip to Tonawanda, for which she was bound.  On almost every material point the witnesses on the opposite sides are in flagrant contradiction of each other; they agree that at the time of dumping to port, the barge was either on or near the port bank.    The testimony in behalf of the libellant is that the barge had carried heavier loads before without accident; that she was full under deck; and that there was no rolling, except when the barge touched bottom, causing it to careen a little.    Capt. Powell, of the barge, testifies as follows:

"Q. What effect did it have on your vessel when she struck in the channel first with her starboard bow? A. It caused her to sheer quickly to port. * * *

"Q. If your vessel started for the port bank after striking on your starboard bow, what, if anything, did you do so far as the tug is concerned? A. I hailed them to stop pulling.

"Q. What reply did you get? A. I didn't get any. * * *

"Q. What was the effect of the tug pulling on your vessel while you were running across on that sheer from starboard to port? (Objected to as immaterial.) A. It was forcing her out on the bank further.

"Q. State what would cause that, both as regards the tow line and as regards any other cause? A. Both the propeller wheel and the line; the tug couldn't get out in the channel to get a cross line to pull on her and the current of the wheel and the line were forcing the vessel on the bank.

"Q. In what direction would the tow line be off your vessel? A. It would be leading off the starboard bows of the vessel a little.

"Q. What was the effect of the tug pulling on your vessel while you were running on that angle and after you touched the bank? A. It would force her out further.

"Q. Whether or not that is what caused her to careen over to starboard. A. That is what was the cause of it.

"Q. When she went over up on that bank that way and after she had gone up on the bank, did the tug stop pulling? A. No, sir.

"Q. What would have been the result if the tug had stopped when you hailed her? A. She wouldn't have gone out so far, consequently she wouldn't have dumped her load; I don't think she would, she would have lost her way more readily and stopped.

"Q. What was the effect then on your vessel going up on the bank and the tug continuing pulling? A. She carried away her stanchions and rail and dumped the load.

"Q. What effect, if any, would the pulling of the tow line at that angle on your boat have in causing her to roll over to starboard? A. It would assist her to roll over to starboard.

"Q. What part of the vessel was it that the stanchions and rail and bulwarks were carried away from her? A. From the fore rigging and the main rigging, a little abaft the main rigging.

"Q. On what side? A. Starboard side. * * *

"Q. After the vessel was relieved of the lumber on the starboard side what was the effect upon her? A. She threw off the port side.

"Q. How did she do that? A. She just rolled back as quick as a flash."

On cross-examination he says:

"Q. You had gone about 1,500 feet and you made your second turn and then you were in a straight channel? A. Yes.

"Q. You think then you went about two-thirds of a mile? A. Yes.

"Q. And then the boat struck? A. She struck an obstruction of some kind which we couldn't see.

"Q. And lost the other part of the load? A. No, the moment she struck this she sheered across the channel, and ran up on the bank, she gradually crawled up on the bank, she didn't do it instantly, she kept crawling up although going very fast, she went up until she lost her balance and threw her load, and back she came as quick as that, and threw the other."

The witnesses from the tug on the contrary state that they were proceeding slowly, and as carefully as possible; that the channel was only from 60 to 100 feet wide; that the barge was cranky and rolling from the start; that each roll toward one side would cause some sheering to the other side; the tug captain testified that he saw from the beginning that she had too much load on top and would require careful handling, and that she was cranky; that the weather was moderate; that the tug kept the center of the channel, and aided all that was possible in keeping the barge up; that when she took her starboard list and dumped her lumber on that side, she was in the center of the channel, and that on recovery she rolled to port and dumped it on the other side, having then a sheer which brought her up on the port bank; that there was no obstruction in the channel; and that there was no contact with the bank which could be felt by the tug at any time, until she came up on the port bank after dumping the lumber, and broke the two lines. He says:

"Q. What part of the channel was she in when she dumped her starboard side? A. Right in the center when she began to roll to starboard, and as she listed to starboard she sheered the other way, sheered to port; it is natural when a vessel takes a bad sheer in the channel going slow—that is the reason you go slow on them, so you can pull on them to straighten them up, but she was so far gone she wouldn't straighten up.

"Q. She struck the port bank before dumping the other side? A. No, when the lumber went off the starboard side she went back the other way as quick as a shot and the line parted at the same time and then she had reached sufficient to fetch up on the port bank.

"Q. How far away from the port bank was she when she dumped the port side? A. She couldn't have been very far because the channel was narrow and she was in the center of the channel when she took the first roll; I don't believe her bow would be 25 or 30 feet off of there."

There are abundant witnesses on each side to sustain these opposite contentions. Under circumstances like the present, in a clear day, in moderate weather, in a quiet stream, the fact that a boat is so loaded as to dump a considerable portion of her deck load, is of itself persuasive evidence that the accident was because the vessel was top-heavy, in the absence of any clear proof that her navigation was such as would naturally be expected to cause a properly loaded boat to dump her cargo. "Res ipsa loquitur." It is not enough to say that if the boat had been towed very slowly, and with extreme care, and had never touched bottom, she might have escaped dumping. She was loaded for a trip to Tonawanda, a distance of several hundred miles. Her loading was bound to be such as would be safe in all or-

dinary changes of weather, and with all the ordinary incidents of navigation, conducted in the ordinary manner. I am persuaded that this boat was not so loaded     See Sumner v. Caswell, 20 Fed. 253.

One explanation of her crankiness is that the lumber loaded above was wet, while that in the hold was dry and lighter. The libellant claims that the lumber was loaded indiscriminately. Whatever the cause, I am satisfied from the testimony that her cranky condition when she started was noted by several persons, and was a subject of solicitude to the captain of the Abbott, who sought as much as in his power to keep the boat straightened up in her rolling and sheering.

Even if the boat, when sheering, in so narrow a channel, occasionally touched bottom, this was but an ordinary incident of navigation with a barge of that draft. It seems to me preposterous to contend that a boat can be rightly loaded so that a touch on the bottom is likely to topple her over. As stated above, the vessel must be so loaded and trimmed as to be able to encounter without danger all the ordinary incidents of the intended voyage.

The account of the accident given by the master of the barge and others in her behalf, seems in one respect highly improbable, viz., that after having run up on the port bank sufficient to keel her over and throw her load to starboard, she should then recover "like a flash" and roll over on the port side so as to dump towards the bank, against and from off which she was inclined. This fact, which is testified to by both captains, viz., that after dumping to starboard she did recover very quickly and roll over and dump to port, better agrees with the testimony of the Abbott's witnesses to the fact that both dumpings were before she touched the port bank; and upon a sheer to port, a pull on the lines running "over the starboard bow," would tend to stop the sheer, not to increase it.

The master of the barge contends that the accident was caused by too great speed of the tug and unskillful pulling on the lines. The testimony on the part of the tug, however, is to the contrary; that the speed was quite moderate, and that even more than ordinary care was taken by the tug. I am satisfied that it was the cranky condition of the boat, and not the lack of due care, that caused the accident. See The King Kalakau, 43 Fed. 172.

The libel must be dismissed, with costs.