## THE ROYAL SCEPTRE.

### (District Court, S. D. New York. February 14, 1911.)

1. SHIPPING (§ 141*)—CONSTRUCTION OF CHARTER PARTY—PRIVATE CARRIER—LIMITATION OF LIABILITY.

When a charter party gives the charterer the full capacity of the ship, the owner is not a common carrier, but a bailee to transport as a private carrier for hire, and provisions in the charter party exempting the owner from liability for injury to cargo from the negligence of officers or crew are lawful and valid.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 141.*

Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.]

2. SHIPPING (§ 141*)—LOSS OF CARGO—LIABILITY OF VESSEL—UNSEAWORTHINESS.

A provision in a charter party which makes the shipowner a private carrier exempting him from liability for negligence of master or crew does not exempt him from liability for loss of cargo by reason of the unseaworthiness of the ship at the commencement of the voyage, or any stage thereof, although caused by negligent loading; there being an implied, if not expressed, warranty of seaworthiness in every contract of charter.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 141.*]

3. SHIPPING (§ 121*)—LIABILITY FOR LOSS OF CARGO—UNSEAWORTHINESS—IMPROPER LOADING.

The turret steamship Royal Sceptre, chartered to carry a full cargo of quebracho wood from the River Plate to New York, loaded at points up the river and had proceeded down to Rosario, when, turning on a hard astarboard helm to reach her anchorage, under the influence of the current and possibly of grazing on the bottom, she careened to starboard until she had a list of 70 degrees, and dumped the most of her deck load, which was lost. When she left her last loading port, she had a deck load of over 700 tons of wood, piled to a height of 11 feet, besides 100 tons of coal, her ballast tanks were nearly empty to lessen her draft in the river, and her range of stability was about one-fourth that calculated for her at sea. There was nothing in the condition of the river or current unusual or which should not have been expected. Held, that the loss of cargo was due to the unseaworthiness of the ship when she finished loading and commenced her voyage by reason of her instability because of improper loading, and that she was liable therefor.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 449–451; Dec. Dig. § 121.*]

4. SHIPPING (§ 121*)—CHARTERS—LIMITATIONS OF LIABILITY.

A provision in a charter by which the charterer assumes the risk of deck stowage presupposed proper loading for deck stowage and a seaworthy ship, and, in the absence of either, does not relieve the ship from liability.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 121.*]

In Admiralty. Suit by the New York Tanning Extract Company against the steamship Royal Sceptre for loss of cargo. Decree for libelant.

The Royal Sceptre is quite a large cargo vessel of the "turret" type, and said by her builders to be a "good timber ship," and "able safely to carry large deck loads." In August, 1908, she was under charter to libelant, which by its agent or controlled company loaded her at Colastine and port Borghi on the River Plate with a full cargo of quebracho wood bound for New York.

Colastine is something over 90 miles above Rosario, and she was there laden to a draft of about 16 ft. 10 inches, which was as much as could safely be taken, owing to shallowness of the river at that point. Borghi is about 12 miles above Rosario, and there the loading was completed, until the vessel drew (mean draft) 21 feet 5¾ inches. This would indicate in river water (fresh) a weight of about 8,562 tons. The ballast tanks were empty, or practically so, in order to secure a full cargo on less than sea draft. Upon the deck of the ship was placed a quantity of quebracho wood variously estimated at from 730 to 780 tons. Absolute accuracy on this point is impossible, but in my judgment the smaller quantity is nearer the truth. There was also on the bridge deck a quantity of coal, variously estimated at from 60 to 100 tons. The chief officer, who says he measured it, deposes to the smaller quantity, yet the log says that about 30 tons were lost by the disaster which gave rise to this action, and the surveyors (making their report a few days after the accident) declare that from statements made "by the captain, chief officer and chief engineer and entries made in their respective logbooks" there were "about 100 tons of bunker coals piled on her bridge deck." It seems to me that the result of this early investigation is more valuable than testimony taken after the advantage of minimizing deck load became apparent. It is concluded that the deck load (cargo and coals) on the Royal Sceptre as she left port Borghi was at least 800 tons and probably more, but how much more cannot be positively affirmed on the evidence. The testimony supports also the surveyors' finding that the "deck load of quebracho wood (reached) a height of about 11 feet above" the deck. At or about the time of leaving Borghi the deck load was partially secured by lashings of wire rope.

Between Borghi and Rosario the current of the river is variously estimated at from two to three knots, and during this stage of the voyage the steamer was making not over six knots through the water. She was in charge of a licensed pilot, who has under oath at different times sworn to two entirely different sets of facts, and whose testimony has been wholly disregarded. After accomplishing in safety and apparently without any indication of possible danger nearly 11 miles of the distance from Borghi to Rosario, she was turned under a hard astarboard helm to come to anchor, in Rosario Roads. This brought her broadside to the current, and near what is called (on the Christophersen map in evidence) the "Dry Sandbank." She had barely begun to turn under her starboard helm when she also began to heel over to starboard, and she continued to careen until she inclined 70 degrees, according to the unanimous estimate of all those who were present, and have testified intelligently. By the time she arrived at this degree of inclination, about 30 tons of her coals and all but about 70 tons of her deck load had gone or was going over side, carrying away bulwarks and fastenings, foremast, and deck appliances. The vessel then righted, intact so far as then known except as to her upper works. She ultimately proceeded to sea without going on dry dock, and delivered the remainder of her cargo in good order. The time was very short within which the steamer thus careened and dumped; and, while absolute accuracy is impossible, I see nothing to impugn the chief engineer's estimate that it was "perhaps half a minute" from the time she began to heel until she "came back again." The suddenness and quickness of the whole occurrence is shown by the fact that three of the crew were carried overboard with the cargo; not having time to get to a place of safety. Of these men two were lost and their bodies not recovered, being in all probability buried in and by the quebracho wood, which is considerably heavier than water. The river was perfectly calm and the weather fine.

Much of the testimony attempts to show that the cause of the steamer's careening was that she ran upon some underwater obstruction, and it was on this point that the pilot swore both ways. It is admittedly true that during the whole period of disaster, and until she shortly after came to anchor, the steamer's engines continued to go ahead, and the vessel to progress through the water.

If it were a material question of fact in this litigation whether the Royal Sceptre touched bottom or not, the point would require careful considera-

187 F.—15

tion, but it cannot and has not been seriously contended that a slight contact with the bottom is a sufficient cause for admitted results. It is plainly true that, if there was contact with the bottom or anything on it, such striking was not severe enough to attract the attention of most of the crew, nor severe enough to cause a leak, and neither did the master say anything regarding such contact when he was first examined. On the other hand, months after this accident, and after the Royal Sceptre had been on the bottom elsewhere, some deformation of her underwater plating was discovered. It seems to me that the testimony on this head reasonably indicates that she lay on a lumpy bottom, something entirely different from a momentary contact with an object hard enough and high enough to give such a heel as admittedly occurred. If the bending of plates subsequently ascertained had been done within the half minute during which the steamer dumped her deck load, it would have been instantly known, and not subsequently reasoned out. It is therefore concluded and found that, while the Royal Sceptre may have touched bottom while turning under her hard astarboard helm, such contact was not sufficient to cause any dangerous or even substantial careening of a stable vessel.

It is further found that the River Plate at and above Rosario is full of shifting sandbanks, contact with which is to be expected by any vessel navigating those waters, and from this it follows that vessels should be so loaded as not to injure their cargoes by bottom contact so reasonably to be expected.

This action is brought by charterer to recover the value of the quebracho wood lost from deck load.

Mr. Montgomery, for libelant.
Mr. Kirlin, for claimant.

HOUGH, District Judge (after stating the facts as above).  [1] Under the circumstances of this affreightment, the owner of the Royal Sceptre was not a common carrier, but a bailee to transport as a private carrier for hire. The Fri, 154 Fed. 338, 83 C. C. A. 205.

By the charter itself, the parties to this litigation agreed that:

"The ship is to be in no way liable for any consequences of * * * perils of the sea * * * collisions, stranding, and/or other accidents or errors of navigation even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariners, or other servants of the shipowners."

It may be assumed with the claimant that the quoted charter provision delimits the obligations of the ship, in so far as it goes, when reasonably interpreted. If therefore the proximate cause of this loss be a peril of the sea (or river), a stranding, an error of the pilot or negligence of the master, it may be assumed that libelant cannot recover; for, without any written limitation of liability, all that the bailor-libelant could require or expect from the bailee-claimant was the use of ordinary care and skill (Sumner v. Caswell [D. C.] 20 Fed. 251, and cases cited), and that expectation has been (in part) bargained away for a consideration presumably expressed in the rate of charter hire.

In view, therefore, of the foregoing, and of the further charter provision that "deck load (was to be) at owner's option and at charterer's risk," some ground of liability must be discovered and substantiated, other than the negligence, of any one concerned in managing or navigating the vessel. Such reason for recovery is assigned in the unseaworthiness of the ship (i. e., unfitness for the stage of voyage), when

the disaster occurred, coupled with the assertion that damage was done solely by reason of such unseaworthiness. The alleged causes of unseaworthiness, unfitness, and disaster are all contained in the statement that the Royal Sceptre on leaving Borghi with a full cargo with a deck load of 800 tons and more, and 11 feet high and with empty ballast tanks, was inherently unstable, and so much so that she was likely to do what she did when impelled by such expected events as putting her rudder hard over, or grazing a sand bank.

[2] If this be true, the ship must respond, and it makes no difference that in one sense of the words the master was negligent in so loading his vessel that there resulted instability amounting to unseaworthiness. The somewhat scholastic answer to such argument is that negligently causing an unseaworthiness existing at the commencement of a voyage (or the beginning of any stage thereof) is an act antecedent to navigation, and not protected against by the charter party clause first above quoted. The more forceful answer is that even a bailee for hire who agrees in executing his bailment to carry goods on his ship impliedly warrants that ship's seaworthiness, and explicitly warrants the same by the familiar words beginning most charters (including the one in suit), and describing the carrier's vessel as "tight, staunch and strong and in every way fitted for the intended voyage." The Europa, Prob. [1908] 84, citing Carver's Carriage by Sea (5th Ed.) § 17; Sumner v. Caswell (D. C.) 20 Fed. 249.

Nor in view of the nature of the warranty of seaworthiness, and the imperative necessity of stringently enforcing it in the interests of all marine business, is it material that to ascertain with exactness the range of stability of any given vessel is a matter of some delicacy and one demanding scientific knowledge. Let it be admitted that such "special technical knowledge is not to be attributed to the master" (The Oneida [D. C.] 108 Fed., note, p. 889), yet that fact only renders it more obligatory upon owners to provide ships which will be stable when laden with such degree of technical or scientific information as competent shipmasters may be presumed to possess.

[3] This leads to an inquiry into the actual condition of the Royal Sceptre, at the time of disaster, a condition confessedly the same as when she left Borghi. The facts regarding her structure and lading have been put before three experts, one of them her designer. They all agree in principle, and with differences too slight to affect decision I think they agree in results. Such differences as exist arise from differing assumptions as to weight and homogeneity of deck load. From their testimony the following conclusions are drawn: The steamer's range of stability did not exceed 46 degrees—that is, she could careen 23 degrees (at most) and retain tendency to return to an upright position—with a list of 10 degrees her righting lever was at its maximum, being .064 of a foot with a righting moment of 565 foot tons, that is, the total force then tending to right her or (same thing) the total force then to be overcome to pull her further over was as last stated. Her curve of stability as calculated by all the experts shows this righting moment rapidly diminishing as the limit of stability was approached. For small inclinations she was very tender, and so con-

structed that a list of about four degrees would bring her "harbour deck" edge under water, which means that a "turret" vessel is shaped (roughly) amidships like a long box, with a smaller but similarly shaped box on top of it, the top of the smaller box being the "turret deck," and the projections of the larger box on each side of the smaller one being the "harbour decks." The effect of submerging the harbour deck edge was to diminish resistance to inclination. At 23 degrees (at most) all righting moment vanished, and the result of natural forces was to produce a tendency toward capsizing, which continued until 37 degrees were reached, when the righting moment reappeared and continued until about 81 degrees of inclination, when, if the pressure continued, complete capsize was accomplished. This condition is to be compared with her designer's assertion that in sea trim her range of stability should be nearly 100 degrees on each side of vertical.

Applying these calculations to the proven facts, and remembering that whatever bottom the steamer touched tended slightly to careen her to starboard, and that at her speed and in the current her starboard helm had the same effect, the conclusion is irresistible that she was too top-heavy to recover from the careening effect of one or both of two causes each trivial and each reasonably to be considered probable before the voyage began. Much time has been spent in examining into the mathematical or physical possibilities of this ship. The results cannot be asserted with absolute accuracy, yet they assist in holding (as is now done) that a vessel is unseaworthy which begins even a river voyage with a range of stability of about one-fourth that calculated for her at sea with a rapidly diminishing righting moment after one-tenth of her calculated range had been passed, which encountered nothing that ought normally to careen her to any pronounced extent, and which did as matter of fact list 70 degrees in half a minute. The result stated seems to me to be reached on much clearer testimony than was available in The Oneida, supra, or The Whitlieburn (D. C.) 89 Fed. 526, and without calling in the aid of presumptions against the steamer as was done in The Oneida on appeal (128 Fed. 687, 63 C. C. A. 239).

[4] But one further contention requires comment. It is urged that, since the charterer agreed to assume the risk of deck stowage, there can be no recovery for loss of cargo so laden; and for this proposition Lawrence v. Minturn, 17 How. 100, 15 L. Ed. 58, is relied on.

Pressed to its logical limit, the untenable nature of the argument seems very plain; for if a vessel can become unseaworthy by piling up deck load, without any liability to the owner of the same, she may capsize as soon as her fasts are thrown off. Deck cargo at shipper's risk does not mean such absolute surrender of all rights. The risk assumed presupposes proper loading for deck stowage and a seaworthy ship. It is not thought that Lawrence v. Minturn asserts any doctrine opposed to this. It speaks only of a jettison; while, if even a jettison be rendered necessary by unseaworthiness existing at commencement of voyage, the ship is liable, as is shown by the summary of decisions given in Compania De Navigacion la Flecha v. Brauer, 168 U. S. at 120–121, 18 Sup. Ct. 12, 42 L. Ed. 398. See, also, Higgins v. Watson,

Fed. Cas. No. 6,470, and Talbot v. Wakeman, Fed. Cas. No. 13,731 (both decisions of Betts, J., in this court), also Barker v. Swallow (D. C.) 44 Fed. 771.

Decree for libelant, with costs.