## THE KAWSAR.

### No. A–16404.

District Court, E. D. New York.

Jan. 11, 1944.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Alfred Ogden, both of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City, proctors (L. deGrove Potter and Michael F. Whalen, both of New York City, of counsel), for claimant.

BYERS, District Judge.

This cause involves damage to cargo, 2,000 cases of olive oil laden on the steamship Kawsar which sailed from Suez on July 29, 1941, bound for New York via the Cape of Good Hope. There were two shipments of 1,000 cases each, containing two 5-gallon tins to a case, and stowage was in lower hold No. 3 except as to about 45 cases which seem to have been carried in No. 3 'tween deck, although the stowage plan does not so disclose, and this aspect of the case is somewhat nebulous.

The ship arrived in New York on October 6, 1941, and when the hatchway was opened into lower hold No. 3, nine feet of water was discovered flooding the entire space and covering the olive oil shipments and also one layer or tier of cotton bales resting on top of the oil, separated therefrom by dunnage.

On the outturn many of the wooden cases were found to be broken, and many of the tins were leaking as the result of the opening of their seams; and some of the tins contained no oil whatever but were filled

---

with dirty water, and others were filled partly with olive oil and partly with such water.

The evidence is not in substantial dispute as to the conditions existing when discharge was undertaken, but conflicting opinions were offered as to the effect of the presence of water upon the cases and tins as observed by those who were called in to survey the cargo at the time of discharge.

The evidence yields the following:

### Findings of Fact.

1. The libelant, Pompeian Olive Oil Corporation, is a Maryland corporation having its principal place of business in the City of Baltimore, Maryland, and was the owner of 2,000 cases containing two 5-gallon tins each of olive oil, laden on the steamship Kawsar at Suez on or about July 27, 1941.

2. The steamship Kawsar was a general ship of Egyptian registry, engaged in the common carriage of merchandise, and had six cargo holds. She is subject to the jurisdiction of this court.

3. Said 2,000 cases of olive oil consisted of two equal shipments of 1,000 cases each, known as the Ergas shipment and the A.R.B. & Co. shipment, respectively.

4. Said 2,000 cases were stowed in the bottom of lower hold No. 3, rising to a height of six or seven feet, except as to 45 cases which were stowed in the 'tween deck space above the said lower hold No. 3.

5. As to the Ergas shipment, a receipt on board in good order and condition is shown, but the receipt contains the following: "Some cases of oil stained by contents, some cases broken and repaired and some tins leaking and soldered and not responsible for contents. Some cases empty and some cases of oil have (sic) empty."

6. As to the A.R.B. Co. shipment, a similar receipt contains the following: "Some cases of oil stained by contents, some cases broken and repaired and some tins leaking and soldered and not responsible for contents. Some tins of oil empty and some have (sic) empty."

7. The libelant received documents entitled "Through Bill of Lading" issued by W. F. Henry Van Der Zee & Co. dated at Izmir May 29 and May 31, 1941, respectively, the Ergas one for 1,000 cases "Refined Pure Olive Oil", and the A.R.B. Co. one for 1,000 cases "said to contain two tins each Refined Olive Oil", which documents contained no reservations similar to those stated on the receipts quoted in Findings 5 and 6.

8. These so-called Through Bills were surrendered by the libelant to the Barr Shipping Corp. in New York in exchange for two Bills of Lading dated at Suez July 27, 1941, issued by The Alexandria Navigation Company, "Order—Notify Barr Shipping Corp. 25 Broadway, New York", covering the said shipments. That referring to the Ergas shipment contained the following: "Some cases of oil stained by contents, some cases broken & repaired & some tins leaking and soldered and not responsible for contents. Some cases empty & some cases of oil half empty."

The notation on the Bill of Lading referring to the A.R.B. Co. shipment contained the following: "Some cases of oil stained by contents, some cases broken & repaired and some tins leaking & soldered and not responsible for contents. Some tins of oil empty and some half empty."

The foregoing Bills of Lading were received by the libelant from the Barr Shipping Corp. upon surrender of those referred to in Finding 7, at the time that freight was collected shortly before the arrival of the vessel in New York.

9. During the voyage, water entered lower hold No. 3 to a depth of about 9 feet, covering the olive oil in cases and one tier of cotton in bales on top of the said cases of olive oil, but separated therefrom by dunnage.

10. Lower hold No. 3 is about 33 feet fore and aft, 19 feet deep, and about 48 feet in width.

11. The hold was flooded to the depth of 9 feet by water from an open pipe and in the 'tween deck space immediately above lower hold No. 3, namely, a fresh water pipe that terminated on the starboard side just aft of the No. 3 hatch between D and E decks. It had originally served to bring water to the steerage quarters in the lower 'tween deck space, which quarters had been partly removed; a short length of that pipe projected through the overhead D deck. Since a new pipe plug had been affixed by November 6, 1941, it is inferred that the exposed end was open during this voyage. That pipe connected with the main line which ran fore and aft under the port side of the B deck. Branching off to starboard from that main line were three pipe lines of one inch interior diameter, the forward one of which was discontinued or dead.

The center line and the after line were capable of use and in each there was a valve with a square headed stem within a circular housing, which valve required the use of a socket wrench to open or close. These valves were not marked.

12. A valve in the said center line above described was not closed during this voyage, so that water from the fore and aft main line entered the said center line and flowed therefrom into the 'tween deck space above lower hold No. 3, and entered that cargo space from the starboard side of the said lower 'tween deck, by way of a 2½-inch by 5-inch triangular opening on the aft side of the first frame forward of the aft bulkhead, which opening should have been closed by a cement chock after the ship's plating had been fitted during the course of the ship's construction.

13. This open pipe end constituted fault and neglect in the ship under the circumstances disclosed; that is, the failure of those responsible for the proper operation of the ship, to cause the said valve to be closed to prevent the flow of water into the 'tween deck space above lower hold No. 3.

14. The bottom of lower hold No. 3 was separated from the tank tops immediately beneath by removable boards, but the tank tops were not cleaned before cargo was taken into lower hold No. 3 on this voyage.

15. There was but one sounding pipe leading into lower hold No. 3 just to the port of the center, leading upward from a so-called hat box, or basin, or bilge well, at the lowest part of lower hold No. 3, which sounding pipe led upward and terminated in an unmarked flange on B deck between No. 3 and No. 4 hatches.

16. During this voyage that hat box, or bilge well, was so clogged with an accumulation of dirt, sand and muck, that sounding through the sounding pipe would have been difficult if not impossible; suction applied to the said bilge well would not have resulted in pumping out the water which had accumulated in the said hold, for the reason that the presence of dirt, sawdust, sand and muck in the said hat box or bilge well would probably have rendered suction impossible.

17. It is not possible to state how long water had been flowing in the manner indicated into lower hold No. 3, because there is no proof on the subject. The water, falling through the said opening in the 'tween deck space, made its way over the top of the stow in lower hold No. 3 and trickled down to the bottom of the hold, and finally that entire space was filled to the depth of 9 feet, as has been stated.

18. Some damage to the cases of olive oil and the tins was caused by the presence of that volume of water in lower hold No. 3; that is to say, as to some of the cases, boards were loosened and carried away, causing the cases to be weakened, and that in turn resulted in some of the tins' being dented and their seams' being opened, whereby the contents escaped from the tins; and in some instances the tins were voided of olive oil entirely, and water from the hold entered in place thereof. Some olive oil remaining in some of the tins, thus opened, was contaminated by the said water. Some of the tins contained pinholes, which could have been the result of rust.

19. Apart from the damage caused by the presence of water, there would have been a certain amount of leakage of olive oil from the tins. For the shortage of oil so created, the carrier would not be responsible.

20. The olive oil in these two shipments was contained in tins and cases of customary weight and texture when shipped from Turkish or Egyptian ports, i. e., the cases were 21 inches long by 14½ inches high by 11⅛ inches wide, having ⅜ inch tops and ½ inch sides of wood.

21. The stowage, as such, was proper.

### Conclusion of Law.

The libelant is entitled to recover for damage to its cargo which can be shown to have resulted from the presence of water in lower hold No. 3.

The foregoing do not admit of extended discussion. There can be no doubt that the libelant has made out a prima facie case, and the two authorities relied on by claimant are not to the contrary:

The Niel Maersk, 2 Cir., 91 F.2d 932, has to do with the deterioration in a cargo of fish meal due to heating and sweating caused by the carrier's failure to provide proper ventilation and stowage. The court said that the cargo owner had failed to sustain its burden of showing that the merchandise was in good order and condition at the time of shipment.

The damage in this case clearly arose from the failure of the carrier to prevent the entry of water into the hold under cir-

cumstances which have been found. There was no defect in stowage or ventilation.

Albers Bros. Milling Co. v. Hauptman, 9 Cir., 95 F.2d 286. This was again a cause based upon damage to a shipment of corn which was said to have suffered from a defect in stowage.

If the distinction between good stowage in a vessel which could properly be characterized as unseaworthy by reason of the uncontrolled flowing of water from the ship's supply into the cargo hold and impossibility of discovering that condition by sounding, and a case of alleged defective stowage or ventilation of the cargo itself, is not obvious, nothing that this court can say will clarify the subject.

The claimant's ultimate position is that the presence of water in this cargo hold did not do any damage, because of the faulty condition of some of the cases and tins when the cargo was laden at Suez. The claimant's briefs argue as though this were true as to all the cases, while the Bills of Lading show that it was the fact as to only some.

I should suppose that the presence of dirty water in many of the tins would answer the contention completely. Even leaky tins and stained cases ought to be immune from such damage as would result from their being submerged in dirty water introduced into the space in which they were carried because of the clear fault and neglect of the ship. No authority to the contrary has been cited.

The libelant is entitled to the usual decree appointing a Commissioner to ascertain the damages referred to in the Conclusion of Law.

Settle decree.