**THE PONCE.**

**No. A 144a.**

District Court, D. New Jersey.

June 28, 1946.

Carpenter, Gilmour & Dwyer, by Carl S. Kuebler, all of Jersey City, N. J. (Bigham, Englar, Jones & Houston, by Henry N. Longley, and F. Herbert Prem, all of New York City, of counsel), for libelant.

Boyle & Archer, and William T. Boyle, all of Camden, N. J. (Rawle & Henderson, and Joseph W. Henderson, all of Philadelphia, Pa., of counsel), for claimant.

S. Rusling Leap, of Camden, N. J. (Lewis, Wolff & Gourlay, by Otto Wolff, Jr., all of Philadelphia, Pa., of counsel), for MacAndrews & Forbes Co., impleaded-respondent.

FORMAN, District Judge.

On February 15, 1941, the San Juan Shipping Company executed a charter party with MacAndrews & Forbes Company, in which it agreed that its steamship Ponce was to be hired to transport a quantity of licorice root from Izmir, Turkey to Camden, New Jersey, on a basis of an agreed amount per ton. The charter party provided that nothing therein should "exempt the Shipowner from liability to pay for damage to Cargo occasioned by bad stowage," and "by improper or insufficient dunnage."

On August 13, 1941, the parties executed an addendum to the original charter party in which they agreed, among other things:

"1. That the quantity provided for in the original charter is hereby increased to a full cargo with the charterers option of shipping any other legal merchandise, excluding arms and munitions, explosives, dangerous and hazardous cargoes. In the event any perishable merchandise is shipped, the risk of deterioration to be for account of shippers and consignees. The charterers are entitled to the full capacity of the vessel under and on deck, the vessel being described as about 173,400 cubic feet bale space available for cargo under deck, with a total dead weight capacity of about 3300 tons (including bunkers, stores, water etc.). In the event cargo is shipped on deck, it is at the risk of the charterers. The owner reserves the right to take aboard en route its own employees for transportation to destination.

"2. That the loading port is hereby changed from Izmir to Iskenderun, Turkey.

"3. That the hire for the vessel is a lump sum of $148,500, cargo to be loaded, trimmed, stowed and discharged free of expense to the steamer, charterers, however, being entitled to the use of all dunnage on board."

In the same month the Pompeian Olive Oil Corporation, a United States importer and packer of olive oil, through its buying agent, Nathan Hurwitz of Washington, D. C., purchased for delivery in the United States 30,000 gallons of olive oil from A. R. Barki & Co., of Izmir, Turkey.

An irrevocable letter of credit was obtained by the Pompeian Olive Oil Corporation from the First National Bank of Baltimore in favor of A. R. Barki & Co., payable against an on board bill of lading covering the shipment of olive oil. C. J. Giraud & Co., a Turkish bank, handled the finances of the transaction for libelant.

Ordinarily, Pompeian Olive Oil Corporation imported its olive oil in bulk in drums and packed it in containers in this country. In 1941 drums were not available to the shipper and the olive oil was placed in tin containers, each of 5 gallons capacity, in a factory at Turan near Izmir. They were than removed to the warehouse of Barki at Izmir, where they were placed in wooden cases, two tins to the case, amounting in the aggregate to 3,000 cases. These were constructed of light wood, nailed together and bound with metal straps. They were about 22½" long, 11" wide and 15" high. The sides were solid and sawdust

was packed between the tins and the inside of the cases. The outside of each case was marked "Pure Olive Oil." The name of the shipper, A. R. Barki & Co., was also marked thereon, and each was given a serial number. It was impossible to see the tins without opening the cases. Several months elapsed between the time the tins were cased and the time they were lightered, and stowed aboard the Ponce, following their transportation by rail to Iskenderon, a distance of about 1,000 miles.

The agent for San Juan Shipping Co. at Iskenderon was Joseph Catoni and MacAndrews & Forbes Company maintained an office there in charge of a Mr. Watts.

At this time shipments and the means of transportation of olive oil were becoming increasingly difficult. Accordingly, arrangements were made by A. R. Barki & Co., through the firm of Van der Zee at Izmir with Catoni and Watts at Iskenderon that the Ponce should take on the olive oil as an "on deck" cargo. MacAndrews & Forbes Company had the right under the charter party to effect such carriage.

The Ponce is described as a three-island ship with a forecastle, bridge, and poop deck, with two cargo hatches on the main deck forward, and two on the main deck aft. The cases were placed with the largest side against the wood-sheathed, metal deck, three tiers deep, and between the port and starboard bulwarks around but not above the hatches. They were chocked off around the winches and freeing ports, and in addition the ship's carpenter shored them at various places along the deck so that the cases would remain stationary. Approximately 1800 cases were placed on the main deck forward and the remaining 1200 aft. No dunnage was provided under the cargo on the forward deck, but some was placed under that carried on the after deck. Tarpaulins were unavailable on the ship and were used neither forward nor aft.

On August 26, 1941, the Master of the ship signed the bill of lading acknowledging receipt in "apparent good order and condition" with the following notations: "Not responsible for leakage," and

"Shipped on deck at Shippers' risk, as agreed."

On the same day the Ponce sailed from Iskenderon for Camden, New Jersey, via Suez, Aden, Capetown and Trinidad. It was the monsoon season in the Indian Ocean. Heavy seas and winds of force 8 on the Beaufort Scale were encountered, and decks were awash on numerous occasions. She arrived in Camden, New Jersey, November 9, 1941. During the voyage the cases remained intact as stowed on deck, but upon discharge they began to leak, and upon examination the tins were found to be pitted with rust.

As a result of the condition of the tins on discharge a quantity of olive oil was lost at Camden and Pompeian Olive Oil Corporation incurred expenses in transferring to drums such quantity of oil as could be salvaged. To recover for its damage it filed its libel in this proceeding in rem against the S. S. Ponce. The San Juan Shipping Company filed its claim to the ship, and impleaded MacAndrews & Forbes Co., as its charterer.

Pompeian Olive Oil Corporation, libelant, contends the cargo was improperly and negligently stowed because it alleges it was incumbent upon the ship to furnish adequate dunnage and tarpaulins. The claimant, San Juan Shipping Company, and the impleaded respondent, MacAndrews & Forbes Co., answer that libelant failed to sustain the burden of proving that the cargo was delivered to the ship in good order and condition, and that since the ship was a private and not a common carrier, the libelant had the burden of proving faulty stowage which it had failed to sustain, and finally that as between the claimant and the respondent if liability exists the other is wholly responsible.

In common carriage relations the rule is that the shipper must first prove damage to his goods. The burden then lies on the shipowner to establish that such damage was occasioned by one of the perils from which he was exempt. Then it is competent for the shipper to show that the damage might still have been avoided by the exercise of reasonable care. Clark et al. v. Barnwell et al., 53 U.S. 272, 13 L.Ed.

985. However, a bailee does not assume a common carrier's obligation as an insurer, and the burden of proving the breach of duty rests upon him who asserts it. Commercial Molasses Corporation v. New York Tank Barge Corporation, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89. The court considers it unnecessary to categorize this contract because: (1) Proof of damage has been shown, (2) the cause of damage was presented, and (3) ample evidence is before the court without resort to inference and presumption from which it can determine if negligence, in fact, exists. Globe Solvents Co. v. S. S. California, D.C., 67 F.Supp. 719, 1946 A.M.C. 674. Where goods are shipped on deck at shipper's risk the carrier is not relieved of due care and attention towards the cargo. Lawrence et al. v. Mintirn, 58 U.S. 100, 15 L.Ed. 58; Pioneer Import Corporation v. The Lafcomo, D.C., 49 F.Supp. 559, affirmed 2 Cir., 138 F.2d 907; The Taibu Maru, 1930 A.M.C. 1055, see The Royal Sceptre, D.C., 187 F. 224.

 It was argued by the claimant and the impleaded respondent that it is incumbent upon the libelant to establish delivery to the carrier in good order. The Goyaz, 2 Cir., 3 F.2d 553; The Joseph J. Hock, 2 Cir., 70 F.2d 259. The specifications in the bill of lading "shipped on board in apparent good order and condition, contents unknown" constitutes prima facie evidence that on the exterior there are no signs of damage. The Niel Maersk, 2 Cir., 91 F.2d 932; The Dondo, D.C., 287 F. 239. Without proof of good internal order upon delivery the court may infer from the facts adduced that damage is due to the negligence of the carrier. The Kawsar, D.C., 53 F.Supp. 323; The Glasgow Maru, 2 Cir., 102 F.2d 450, modified on other grounds 2 Cir., 103 F.2d 430; Matilda Peirce, 2 Cir., 32 F.2d 688, 1929 A.M.C. 779; Aunt Jemima Mills Co. v. Belge, D.C., 28 F.2d 398, The Burgondier, 1928 A.M.C. 1635. The evidence before the court is bereft of any facts indicating good internal order but there is no claim for damage due to defects inherent in the oil. On the contrary, claim for damages arises out of deterioration of the tin containers in which the oil was shipped. We do not understand that libelant must prove, affirmatively, absence of deterioration of the tin cans which were solidly enclosed by the wooden cases at the time the cargo was delivered to the carrier. It proved an absence of any signs of leakage at that time, and until the cases were handled for discharge upon arrival at Camden, New Jersey. The inference is justified that the cases were delivered to the ship in good order.

Libelant's former secretary testified that libelant followed the custom to ship edible oil in metal drums below decks, but that on account of the urgent need for olive oil at this time and the acute shortage of ships, it was willing to accept the risk of an on-deck shipment. The witness pointed out that on-deck shipments of similar cargo without tarpaulins had been made on two other ships, and that no loss was suffered, suggesting, of course, there would be no loss here except for the negligence of the ship.

Libelant also produced Captain Berg who had sailed the seas for 50 years and it was his opinion that the method of stowage was improper. He proposed that the cargo should have been stowed on the hatches about six tiers high and covered with tarpaulins lashed to the ring bolts around the hatch coamings. As an alternative he proposed that the cargo should have been stowed two tiers high on a "false deck" or platform made of planks, extending from the hatch coaming to within two feet of the bulwarks, and covered with tarpaulins battered down at the base. It was his opinion that dunnage would have made no difference to the cargo as stowed, and that tarpaulins, if used, might have been torn loose in a wind exceeding Force 8. He claimed that his proposed method would provide appropriate drainage to goods stowed on deck. It was argued that his method of utilizing the hatch covers as storage space would adversely affect the stability of the ship because the cargo would attain a height of six tiers. It was also objected that it would put the hatches in disuse, and that the building of the raised deck would present a burdensome job of construction.

Claimant's witness, Captain Cocks, a cargo surveyor for 25 years and with 20

years experience at sea, testified that the cans as packed were inadequate for an on-deck shipment. It was his opinion that tarpaulins would have been protective in a degree, but that the cases would become wet, and that the constant pitching and rolling of the ship and movements of the cargo would chafe the tarpaulins. He declared that the cargo did not interfere with scuppers and freeing ports and that it was properly stowed.

Others testified that tarpaulins lashed around this cargo would wash away at sea, since it is difficult enough to secure hatch covers even when strung through ringbolts and battened down.

Scientific information was introduced regarding the corrosive effects of salt water on tin by an analytical chemist and a doctor of chemistry. Chemical analysis by tests showed corrosion in 10 days and pronounced corrosion in 20 days, and it was pointed out that while the sawdust packing was an effective cushion, it promoted corrosion of the tin because it retained and absorbed the moist sea spray.

Libelant urges upon the court the application of Pioneer Import Co. v. The Lafcomo, supra [49 F.Supp. 562]. Therein, the libelant shipped cases of lily of the valley pips "on deck at shipper's risk" and the court found the agreement of the parties contemplated stowage on the forward deck with a condition specifically made that the cargo should be properly covered with tarpaulins. The cases were stowed on the wings of the hatches, and blocked freeing ports so that the lower tiers of the stowage were submerged in sea water for considerable periods of time.

Herein, there is in evidence a copy of a letter from C. J. Giraud & Co., addressed to Joseph Catoni & Co., with the following postscript:

"We rely on you to supervise the proper stowage of these 3000 cases on deck. We have no doubt that they will be shipped on some aft well deck and will be efficiently protected by tarpaulins properly battened down. We rely on you in this matter."

Libelant argues that the cited case is controlling, but we see material differences: First, we do not believe that the above post-script in the letter from C. J. Giraud & Co. is a condition of the contract of shipment binding upon the ship, her owners or the charterers. Such request at best contains only words of hope and desire not rising to the level of a binding contractual condition. Our second differentiation is a factual one because it appears that in the Lafcomo case the means of drainage were obstructed, while in this case there was no obstruction.

The evidence shows that the Ponce encountered heavy seas and winds of Force 8, during the monsoon season. It is not unusual for decks to be awash in such weather, and thus our inquiry is whether the absence of tarpaulins constitutes negligence. We believe not. The expert witnesses gave convincing testimony of the difficulties to be encountered in lashing down tarpaulins, and even libelant's witness admits this. Furthermore, the expert chemists were of the opinion that tarpaulins would have retarded evaporation of the salt spray lodged in the sawdust packing and would have accelerated corrosion. We, therefore, conclude that the absence of tarpaulins is not a contributing factor.

With reference to the contention that the absence of sufficient dunnage constitutes improper stowage we think the result speaks for itself and answers this argument. On discharge investigation showed that the tins were indiscriminately pitted throughout—on the foredeck and afterdeck, and in the top, middle and bottom tiers. We may add to this the testimony indicating that deck drainage was unimpaired by the stowage.

Our attention has been called to the recently decided case of Globe Solvents Co. v. S. S. California, supra, which involves an on-deck shipment of lacquer in drums and cases from Philadelphia to San Diego, California. When the cargo arrived at its destination many of the cases were extensively water-stained, rusted and pin-holed. In this case the court was convinced that the use of dunnage 8 inches high under the cargo would have prevented it from getting wet. In our case we are convinced that neither dunnage nor

730

the construction of a "false deck", as suggested by Captain Berg, plus the use of tarpaulins would have prevented the cases from getting wet in the normal course of the cruise from Iskenderon to Camden. Our case convinces us that this cargo was bound to come in contact with moisture and that the tin containers were simply inadequate to resist the corrosive effect of the water.

Proof was offered to show that the law and regulations of Turkey prohibited the exportation of dunnage and tarpaulins. This testimony cannot affect the decision in this case because it is found that the damage incurred was not due to failure to use this material but rather to the inadequacy of the tin containers in which libelant's product was shipped under the circumstances of this voyage. The court concludes that the stowage was proper and that the damages occurred because of the usual, expected hazards to an on-deck shipment. It appears that libelant was willing to take this risk, and for want of more suitable containers it chose to make use of tin cans which proved inadequate. If goods, as they are wrapped or cased, are not fitted to endure the ordinary hazards of the voyage the ship is not liable. 46 U.S.C.A. § 1304(n); see Bache v. Silver Line, 2 Cir., 110 F.2d 60. The libel and petition impleading respondent are dismissed.