**BLANCHARD LUMBER COMPANY and Furman Lumber, Inc., Libellants,**

v.

**S.S. ANTHONY II, her engines, boilers, etc., and Mardoro Cia. Nav. S.A., and Anglo Canadian Shipping Company, Limited, Respondents.**

**No. 63 Ad. 526.**

United States District Court
S. D. New York.

July 12, 1966.

Hill, Rivkins, Louis & Warburton, New York City, for libellants, Alan S. Loesberg, Vincent J. Ryan, New York City, advocates.

Healy & Baillie, New York City, for respondents S.S. Anthony II and Mardoro Cia. Nav. S.A., Allan A. Baillie, New York City, advocate.

Zock, Petrie, Sheneman & Reid, New York City, for respondent Anglo Canadian Shipping Co., Limited, Howard M. McCormack, New York City, advocate.

Kelly, Donovan, Robinson & Maloof, New York City, for libellants, amicus curiae, John P. Conroy, New York, N. Y., advocate.

Bigham, Englar, Jones & Houston, New York City, for libellants, amicus curiae, Warren H. Greene, Jr., New York City, advocate.

Maight, Gardner, Poor & Havens, New York City, for respondent Shipowners, amicus curiae, John J. Hearn, New York City, advocate.

Symmers, Fish & Warner, New York City, for respondent Charterer, amicus curiae.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

In this suit, the libellants, Blanchard Lumber Company (hereinafter "Blanchard") and Furman Lumber Inc. (hereinafter "Furman"), consignees and owners of certain shipments of lumber bound from British Columbia to Providence, Rhode Island, sue for non-delivery and certain damage to such cargo. The respondents are Mardoro Cia. Nav. S.A. (hereinafter "Mardoro"), the owner of the S.S. Anthony II (hereinafter "Anthony II"), and Anglo Canadian Shipping Company, Limited (hereinafter "Anglo Canadian"), the charterer of the said vessel.

After hearing the testimony of the parties, examining the exhibits, the pleadings, the briefs and Proposed Findings of Fact and Conclusions of Law submitted by counsel, and after examining the memoranda submitted Amici Curiae, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Macmillan, Bloedel and Powell River, Ltd. (hereinafter "Macmillan"), a Canadian corporation doing business at Vancouver, British Columbia, was the shipper of all cargoes of lumber involved in this action, and libellants Blanchard and Furman were the consignees and owners of the cargoes of lumber involved. The lumber was shipped under the terms of bills of lading P–2 to P–10, dated October 11, 1962, Victoria, British Columbia/Providence, Rhode Island. (Lib. Exs. 1–8) Respondent Mardoro is a corporation organized and existing under and by virtue of the laws of the Republic of Panama, and at the times hereinafter mentioned was the registered owner of the Anthony II. Respondent Anglo Canadian is a Canadian corporation with its principal place of business at Vancouver, British Columbia, and at the time in question was the time charterer of the Anthony II, pursuant to the terms of a time charter party dated September 17, 1962 with respondent Mardoro. (Pre-Trial Order 3(a) (2); Mardoro Ex. B)

2. The charter party, dated September 17, 1962, is between Mardoro as owners of the Anthony II and Anglo Canadian as charterers.[1] The owners agreed to let and the said charterers agreed to hire the said vessel from the time of delivery for a voyage from British Columbia via the Panama Canal to the United States north of Cape Hatteras.[2]

The vessel was to be placed at the disposal of the charterers at British Columbia with a full complement of officers and crew and was to be employed in carrying lawful merchandise as the charterers or their agents should direct on certain conditions, among others as follows:

1.[3] The owners were to provide and pay for all provisions, wages of the crew, and insurance.

2. The charterers were to pay for fuel and fumigation necessitated by their use of the vessel, and were in addition to provide necessary dunnage and shifting boards, extra fittings requisite for unusual cargo, but the owners were to allow them the use of any dunnage and shifting boards already aboard.

4. Payment for hire was to be based on $1.50 per ton on vessel's total deadweight carrying capacity per calendar month.

7. The whole reach of the vessel's hold, decks, etc. were to be at the charterers' disposal.

"8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, trim *and discharge* the cargo at their expense under the supervision of the Captain *and the responsibility* of the Captain who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts."[4]

9. If the charterers were dissatisfied with the conduct of the Captain or officers, the owners would investigate upon receiving particulars, and if nec-

---

1. Due to a typographical error, the name of the owner appears as "Madoro Cia. Nav. S.A." in the charter.

2. The charter was a standard New York Produce Exchange Time Charter, as amended to October 3, 1946, with many modifications by the parties.

3. These numbers correspond to the numbered paragraphs in the charter party.

4. Here and elsewhere, italicized portions of the charter are those added to the form by the parties.

essary, make a change in the appointments.

"11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages * * *."

18. The owners were to have a lien upon all cargoes and all sub-freights for any amounts due under the charter.

"22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to *five tons weight at each hatch in single rig*, also providing ropes, falls, slings, and blocks. Equipment and gear for heavier lifts shall be for Charterers' account * * *."

23. The vessel was to work night and day if required by the charterers.

"26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the navigation of the vessel, insurance, crew, *and cargo claims* and all other matters, same as when trading for their own account."

29. The owners were to stow shiftingboards away so as not to interfere with cargo operations.

"40. *Charterers are to pay for the cost of lashing the deck cargo but it is understood that the vessel is to be equipped with pad eyes or other suitable means of securing chain lashings and any expense in this connection is to be borne by the Owners.*"

3. Anthony II was a vessel which was built in Hamburg, Germany in 1957 with six cargo hatches, three hatches forward of the mid-ship house and three hatches aft the mid-ship house, and which vessel at the time in question was under the command of Captain Michael Kyrtatas, a Greek citizen.

4. On September 18, 1962, respondent Anglo Canadian, in the City of Vancouver, British Columbia, entered into a freight arrangement with Macmillan for the reservation of space for the account of Macmillan in the Anthony II for the carriage of cargo of packaged lumber from British Columbia to ports in the Port Everglades/Boston, United States of America range by shipment carried on deck. (364–365; Anglo Canadian Ex.L)

5. Before September 28, 1962, the Anthony II arrived at Chemainus, British Columbia, for delivery under the time charter above mentioned. At this time the Master of the Anthony II, Captain Michael Kyrtatas, signed a letter of authority addressed to Anglo Canadian authorizing thirteen named individuals to sign bills of lading on his behalf covering the cargo loaded in the Anthony II according to Mate's receipts as signed by the chief officer and/or the final official Pacific Lumber Inspection Bureau certificates or mill certificates. (Anglo Canadian Exs. A, E; 284)

6. The bills of lading issued to libellants recite that certain goods were received from Macmillan for carriage to Providence, Rhode Island, listing certain packages of lumber, all to be shipped on deck. These bills of lading were prepared and issued by Anglo Canadian pursuant to written authorization of the Master. (284–285, 398; Anglo Canadian Ex. E) They bear the heading:

"ANGLO CANADIAN SHIPPING
COMPANY LIMITED
VANCOUVER, B. C.
BILL OF LADING."

Clause 6 of the bills of lading reads in part as follows:

" * * * Live animals or cargo carried on deck and stated in this bill of lading to be so carried shall be carried only at Merchant's risk."

The bills of lading also contain the "Paramount Clause," which is as follows:

"The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August, 1924, as enacted in the country of shipment shall apply to this contract. When no such enactment is in force in the country of shipment, the

corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention (save for Article IX of the said Rules) shall apply.

"With respect to goods loaded at a Canadian port, the Water Carriage of Goods Act, 1936, of the Dominion of Canada shall be effective. With respect to goods loaded at a United States port, the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, shall be effective.

"If any term of this Bill of Lading be repugnant to the said Rules or enactments to any extent, such term shall be void to that extent, but no further."

In addition, the bills of lading contain the following clause:

"13. Nature of Contract

"The Contract evidenced by this Bill of Lading is between the Merchant and the Owner of the vessel named herein (or substitute) and it is therefore agreed that said Shipowner only shall be liable for any loss, damage, or delay due to any breach or non-performance of any obligation arising out of the contract of carriage, whether or not relating to the vessel's seaworthiness. If, despite the foregoing, it is adjudged that any other is the Carrier and/or bailee of the goods shipped hereunder, all limitations of, and exonerations from, liability provided for by law or by this Bill of Lading shall be available to such other.

"It is further understood and agreed that as the Line, Company or Agents who has executed this Bill of Lading for and on behalf of the Master is not a principal in the transaction, said Line, Company or Agents shall not be under any liability arising out of the contract of carriage, nor as Carrier nor bailee of the goods."

This clause is commonly referred to as the "demise" clause.

The bills of lading conclude:

"IN WITNESS whereof the Master of the said Vessel has signed THREE/3 Bills of Lading all of this tenor and date, one of which being accomplished, the others to stand void.

"Dated at VANCOUVER, B. C. this 11th day of OCTOBER 1962.

For and By Authority of Master" [5]

(Lib. Exs. 1–8)

Anglo Canadian was paid "freight" upon issuance of these bills of lading. (402–404) This "freight" was deposited in part in the bank account of Anglo Canadian. Anglo Canadian also appointed United States agents to handle the ship in question and paid United States stevedores to unload the vessel in this country. (402–409)

7. A partial timber deck cargo was loaded on the Anthony II at the Port of Victoria, British Columbia on October 11, 1962. This deck cargo included the lumber of libellants, which is the subject of this action. The loading was physically performed by stevedores furnished by the Canadian Stevedoring Company Ltd., which stevedores were engaged and paid by respondent Anglo Canadian.

The deck cargo was loaded under the supervision of a supercargo employed on an hourly basis by Anglo Canadian for that purpose, though he had additional duties, as well as under the supervision of the chief officer of the Anthony II. The crew of the Anthony II took no part

5. The bills of lading were signed by Miss. Bloxham or Mr. George G. Bennett, two employees of Anglo Canadian who were authorized to so sign by the Master. (382; Anglo Canadian Ex. E)

in the loading. When the loading was completed, it was inspected by the Master of the Anthony II, though he did not inspect the top of the stow. The supercargo did not remain aboard the vessel while at sea.

8. The cargoes which are the subject of this action were carried in the vicinity of the Nos. 3 and 4 hatches. The lumber was stowed to a height of approximately 9 feet above the deck at said Nos. 3 and 4 hatches. At the other hatches the lumber was stowed to a height of less than 9 feet above the deck.

9. Fork-lift trucks were placed over the lumber stowed at each of the vessel's six hatches, including that of libellants, stowed at the Nos. 3 and 4 hatches. These fork-lift trucks were owned, supplied and stowed on top of the lumber by the Canadian Stevedoring Company Ltd., the loading stevedores, hired by respondent Anglo Canadian. Both the supercargo and the Master were aware that the fork-lift trucks had been so placed by the stevedores.

10. The lumber cargo was packaged in standard size packages 4 feet in width and 2 feet in height, which packages were placed beside of and piled on top of one another on the hatches of the Anthony II. The length of the packages of lumber on the top layer at the No. 3 hatch ranged from approximately 14 feet to 22 feet. The length of the packages of lumber at the No. 4 hatch ranged in length from 6 feet to 24 feet. (189–190)

11. Fork-lift trucks were used in the loading of this cargo. After completion of loading at Victoria, the fork-lift trucks in each hatch were stowed in a well made in the lumber by removing one or two bundles of the lumber at the top of the piles. Then the entire deck load was lashed and secured, using chains supplied and paid for by Anglo Canadian. Stevedores from the Canadian Stevedoring Company Ltd., employed by Anglo Canadian, lashed the deck cargo as described above, with the fork-lift trucks included.

12. The fork-lift trucks which were stowed on top of the lumber deck cargo weighed approximately 5 tons each and were about 4 feet wide and 7 feet high. The length of the body plus the length of the forks projecting forward was 9 feet, of which 4 feet was the length of the forks themselves. The fork-lift trucks had balloon tires. The forks of the fork-lift trucks were 6 inches in width and the space between the forks was 3 feet 6 inches. (185–186, 313–314)

13. The shortest package of lumber on the top layer of the stow at the No. 3 hatch was 14 feet in length. The total length of the fork-lift truck was 9 feet, leaving a total of free space fore and aft of the fork-lift truck of 5 feet. The Master testified that the maximum space between the end of the fork-lift truck and the bundles of lumber stowed forward of them was approximately 2 to 3 feet. Thus, a package of at least 11 feet in length was removed or never stowed at hatch No. 4. (189–190, 38)

14. The chains used to secure the deck load of lumber were not new and some of them were rusty. These were placed 10 feet apart. One of the identical chains used to hold the lumber in place was also passed over each of the fork-lift trucks in an endeavor to secure the fork-lift trucks on top of the deck lumber stow at hatches Nos. 3 and 4. This chain passed over each fork-lift truck at approximately the spot where the operator of the fork-lift truck would place his feet. (20–24; Lib. Exs. 10–12; Anglo Canadian Ex. H)

15. The height of the stow above the deck at the Nos. 3 and 4 hatches was 14 feet, consisting of lumber to the height of 9 feet above the deck, with the fork-lift trucks placed in a 2 foot deep void space and extending 5 feet above the top of the stow. The total amount of lumber stowed in the vicinity of the No. 3 hatch was 183,000 board feet and in the vicinity of the No. 4 hatch, 197,000 board feet, the weight of each 1,000 feet of lumber being approximately 1.5 tons.

16. After the partial shipments of lumber, which are the subject of this action, were loaded on deck and lashed at Victoria on October 11, 1962, the timber deck cargo was then surveyed by the port

warden, Captain Newell, and he found the vessel to be in a seaworthy condition to proceed to the next and final loading port, Port Alberni. Captain Newell also physically checked the lashings and chains as far as he could see with the deck cargo in place. (265; see Anglo Canadian Ex. B)

This inspection was made according to the regulations and rules of the Candian Shipping Act covering the carriage of timber deck cargoes on ocean-going vessels which require an authorized surveyor directed by the Ministry of Transport to make an inspection. Such surveyors so designated are known as authorized surveyors for Dominion Government for timber deck cargoes. Captain Newell did not consider himself concerned with the lashing of the fork-lift trucks on top of the deck cargo, however. He could not recall how they were lashed or whether they were lashed. He was not concerned with that stowage, he testified. (255–256) The fees of the port warden were paid by Anglo Canadian. (409)

At the Port of Chemainus, British Columbia, on October 5, 1962, a preliminary timber deck cargo survey was conducted by Arnold Moran, an authorized surveyor for the Dominion Government for timber deck cargo surveys. This survey included an inspection of the chains and turnbuckles which were to be used to secure the load of timber deck cargo and the chains were found to be spaced a maximum of 10 feet apart and in good order. (See Anglo Canadian Ex. I)

17. It was never customary to carry fork-lift trucks on top of deck cargoes of lumber shipped from the Port of Victoria. (180, 349) The Master of the Anthony II, previous to the subject voyage, had never carried fork-lift trucks on top of deck cargo. (15)

18. Previous to this voyage and shipment, the Master of the Anthony II had carried full timber cargoes with deck lumber on eleven occasions and had never had any problems. (14, 43)

19. In the late evening of October 11, 1962 or the early morning of October 12, 1962, after the Anthony II had left Victoria and was proceeding to Port Alberni, B.C. to pick up additional cargo, then to proceed to East Coast ports in the United States, the ship encountered a storm.

20. At 0030 of the morning of October 12, 1962 (12:30 A.M.) the fork-lift trucks began to move slowly on the top of the lumber on Nos. 3 and 4 hatches and then faster, and the chain which passed over the fork-lift trucks and the lumber parted, the fork-lift trucks broke stow and were lost and libellants' lumber broke stow and was lost. (27–28, 31–32)

21. The chain passing over the fork-lift truck and the lumber was the one that specifically parted on top of hatch No. 3. (29–31) On No. 4 hatch the chain which passed over the fork-lift truck and the lumber also parted, creating a condition where the remaining chains on that hatch could not perform the function they were designed for, that is, to hold the deck load down, and some of the other chains also parted. (34, 202, 203)

22. No unusual or overwhelming sea or weather conditions caused the chains to part or caused the loss of the fork-lift trucks and deck cargo at hatches Nos. 3 and 4, although the Master admitted that in sailing from Victoria he knew that bad weather might be encountered.

23. Dr. William Donn, Professor of Meteorology and Oceanography at City College of New York and a Senior Research Scientist in charge of the meteorology research program at Lamont Geological Observatory of Columbia University, demonstrated, and I find, that the storm encountered by the Anthony II was not unusual weather for the period during October and should have been anticipated and expected. Nor was it irresistible or overwhelming in its power.

24. The distance from Victoria to Port Alberni is approximately 134 nauti-

cal miles. (327–329) The waters between the two ports are, in part at least, exposed waters. (232)

25. The purpose of chain lashings is to hold lumber deck cargo in place. The inclusion of the fork-lift trucks created a condition in which there was no friction which would allow the chains to grip, as they would an ordinary lumber deck cargo. Thus, the fork-lift trucks were permitted to slide. This sliding caused the cargo to move, the chains to part, and the resultant cargo loss. (31–32, 196–197, 202–203; Lib. Ex. 21)

26. The carriage of the fork-lift trucks on top of the deck cargoes of lumber was done as a convenience to the stevedores and such carriage subjected libellants' cargo to additional risks to which deck cargo is not customarily or usually subjected.

27. The stowage of the fork-lift trucks on top of the lumber deck cargo in the manner done here constituted negligence on the part of Anglo Canadian's agents, the stevedores. The permitting of such stowage constituted negligence on the part of Mardoro's agents, the chief officer and the Master. Thus, both Anglo Canadian and Mardoro were negligent with respect to the stowage of this deck cargo. Moreover, such stowage rendered the ship unseaworthy. Such stowage was the proximate cause of the loss of libellants' lumber.

28. Proper stowage would have avoided the damage herein.

---

6. It is by no means clear that the Canadian Act should apply here. The Canadian Act, like the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315, explicitly excludes regulation of deck cargo. The "Paramount Clause" merely says the Canadian Act is applicable and does not limit the application of the deck cargo exclusion as was the case in Pannell v. The S.S. American Flyer, 157 F.Supp. 422 (S.D.N.Y.1957), modified on other grounds 263 F.2d 497 (2nd Cir.), cert. denied 359 U.S. 1013, 79 S.Ct. 1151, 3 L.

## DISCUSSION

### I.

### APPLICABLE LAW

The first question is what law is applicable to determine the legal relationships formed under the bills of lading in this case. The Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315, does not regulate the carriage of "cargo which by the contract of carriage is stated as being carried on deck and is so carried." 46 U.S.C. § 1301(c). Accordingly, that has no application ex proprio vigore to the lumber shipments here.

Turning to the bills of lading, each of them contains the "Paramount Clause" set out above in Finding of Fact No. 6. That clause, respondent Anglo Canadian argues, makes applicable the terms of the Canadian Water Carriage of Goods Act, 1936, 1 Edw. 8, ch. 49, which, when applied, will foreclose any liability on Anglo Canadian's part on the ground that it is not a carrier within the meaning of the Canadian Act.[6] Both the libellants and respondent Mardoro claim, on the other hand, that the Harter Act, 46 U.S.C. §§ 190–196, applies and prohibits the operation of any clauses in the bills of lading which purport to exculpate Anglo Canadian from liability for negligence. See the "demise" clause in Finding of Fact No. 6. Assuming that Canadian law, if applied, would operate to exculpate Anglo Canadian from liability for negligence, see The Iristo, 43 F.Supp. 29 (S.D.N.Y.1941), aff'd sub nom. Middleton & Co. (Canada), Ltd. v. Ocean Dominion S.S. Corp., 137 F.2d 619 (2nd Cir.

---

Ed.2d 1037 (1959), where the bill of lading explicitly stated that the Carriage of Goods by Sea Act applied " * * * 'notwithstanding Sec. 1(c) thereof * * *.'" 157 F.Supp. at 425. For the purposes of this case, it need not be decided whether the deck cargo exclusion of the Canadian Act is operative under the terms of the bills of lading, since I have concluded that as a matter of law the Harter Act, 46 U.S.C. §§ 190–196, and not the Canadian Act, is applicable. See discussion in text, infra.

1943), Section 1 of the Harter Act, 46 U.S.C. § 190,[7] if applicable, forbids such exculpation.[8] Knott v. Botany Worsted Mills, 179 U.S. 69, 71–72, 21 S.Ct. 30, 45 L.Ed. 90 (1900). In Knott, the Supreme Court refused to apply a clause which purported to make English law applicable and applied the Harter Act instead.

■ The Harter Act applies to bills of lading covering merchandise shipped in any vessel from foreign ports to United States ports. Knott v. Botany Worsted Mills, supra. Accordingly, it is applicable to the present case and Section 1 thereof operates to prohibit the inclusion in bills of lading of clauses which serve to exculpate from liability for negligence. The Harter Act, enacted in 1893, preceded the Carriage of Goods by Sea Act and does not exclude bills of lading as to deck cargo from regulation, but those facts, in my opinion, do not affect its applicability under the circumstances of this case. Section 12 of the Carriage of Goods by Sea Act, 46 U.S.C. § 1311, "does not expressly preserve the Harter Act as to deck cargo from 'tackle to tackle'; [it] merely preserved the Harter Act before loading and after discharge." Knauth, Ocean Bills of Lading, 236 (1953). In the absence of an affirmative legislative expression to the contrary, however, I see no reason for holding that the Harter Act is superseded in all cases by the Carriage of Goods by Sea Act as to deck cargo in the "tackle to tackle" period. In this case, where there is at least doubt as to the applicability of the Canadian

Water Carriage of Goods Act, see fn. 6 supra, and where the Canadian interpretation of that statute leads to a result strictly contrary to the one reached by American courts interpreting similar language in the comparable American statute, namely, The Carriage of Goods by Sea Act, see Epstein v. United States, 86 F.Supp. 740 (S.D.N.Y.1949) and discussion in text, infra, it is my opinion that American law, and specifically the Harter Act in this case, must be applied in order that the strong American policy of protection to shippers, evidenced by both the Harter Act and the Carriage of Goods by Sea Act, may be maintained.

II.

EFFECTIVENESS OF EXCULPA- TORY CLAUSES IN THE BILLS OF LADING

The bills of lading involved herein contain (1) a "demise" clause whereby the shipper purportedly agreed that the contract of carriage was made solely with the registered owner of the vessel, and (2) a clause which purports to state that deck cargo is carried at the shipper's risk.

■ (1) The "demise" clause, if valid, would effectively insulate the charterer Anglo Canadian from any form of liability. Since Section 1 of the Harter Act specifically prohibits clauses which purport to exculpate managers, agents, masters, or owners from negligence, the "demise" clause must fail in its purpose of exculpating the charterer here. Epstein v. United States, supra.

7. "It shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect."

8. The bills of lading herein provide:
    "Subject to Clause No. II (Paramount Clause) * * * this Bill of Lading no matter where issued shall be construed and governed by English Law."
    Assuming Canadian law inapplicable, see fn. 6 supra, the bills of lading call for English law but that choice cannot be respected if English law allows the operation of exculpatory clauses. If it does not, English law reaches the same result as the Harter Act; but if it does, the Harter Act, nonetheless, applies to prohibit any exculpation. Knott v. Botany Worsted Mills, supra.

Even before the Harter Act, as early as 1876, the United States Supreme Court declared that common carriers may not throw off their liability "by any declaration or stipulation that they should not be considered such carriers." Bank of Kentucky v. Adams Express Co., 93 U.S. 174, 181, 23 L.Ed. 872 (1876). As stated by Mr. Justice Strong, the carrier "cannot, by any contract with his customers, relieve himself from responsibility for his own negligence or that of his servants; and this because such a contract is unreasonable and contrary to legal policy. So much has been finally determined in New York Central Railroad Company v. Lockwoood, 17 Wall. 357, 21 L.Ed. 627." Ibid.

The decision of Judge Conger in The Iristo, supra, is not applicable here. There the shipment was from Canada to Bermuda. Hence, the Court and the parties properly assumed that Canadian and not American law applied and that the case was governed by the Canadian Act and its interpretation by Canadian courts, which allow "demise" clauses to be effective.

■ (2) Under Section 1 of the Harter Act and under the American common law, a carrier is not permitted to utilize clauses relieving itself from a duty to properly stow the cargo or to exercise due diligence to make the vessel seaworthy. Compania de Navigacion La Flecha v. Brauer, 168 U.S. 104, 123–124, 18 S.Ct. 12, 42 L.Ed. 398 (1897); The Ponce, 67 F.Supp. 725, 728 (D.N.J.1946); The Royal Sceptre, 187 F. 224, 228 (S.D.N.Y. 1911). In Compania de Navigacion La Flecha v. Brauer, supra, Mr. Justice Gray wrote:

"The bill of lading itself shows that all the cattle to be carried under this contract were to be on deck. The words 'on deck at owner's risk' cannot have been intended by the parties to cover risks from all causes whatsoever, including negligent or wilful acts of the master and crew. To give so broad an interpretation to words of exception inserted by the carrier, and for his

benefit, would be contrary to settled rules of construction, and would render nugatory many of the subsequent stipulations of the bill of lading." 168 U.S. at 123–124, 18 S.Ct. at 17.

In The Royal Sceptre, supra, Judge Hough wrote:

"* * * It is urged that, since the charterer agreed to assume the risk of deck storage, there can be no recovery for loss of cargo so laden; and for this proposition Lawrence v. Minturn, 17 How. 100, 15 L.Ed. 58, is relied on.

"Pressed to its logical limit, the untenable nature of the argument seems very plain; for if a vessel can become unseaworthy by piling up deck load, without any liability to the owner of the same, she may capsize as soon as her fasts are thrown off. Deck cargo at shipper's risk does not mean such absolute surrender of all rights. The risk assumed presupposes proper loading for deck stowage and a seaworthy ship. * * *" 187 F. at 228.

And in The Ponce, supra, Forman, D. J., stated:

"Where goods are shipped on deck at shipper's risk, the carrier is not relieved of due care and attention towards the cargo." 67 F.Supp. at 728.

■ The warranty of a vessel's seaworthiness extends to unseaworthiness due to faulty stowage of cargo. Oxford Paper Co. v. The Nidarholm, 282 U.S. 681, 51 S.Ct. 266, 75 L.Ed. 614 (1931); Pioneer Import Corp. v. The Lafcomo, 138 F.2d 907 (2nd Cir. 1943), cert. denied 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063 (1944). As stated by Judge Clark in Pioneer Import Corp. v. The Lafcomo, supra:

"The shipper accepted the risk of losses from carriage on deck only so far as they occurred under proper stowage." 138 F.2d at 908.

■ The fact, then, that the libellants' lumber was deck cargo does not bar recovery. The clauses in the bills of lading which purport to state that deck cargo is carried at shipper's risk do not relieve the carrier or carriers in this

case from a duty to stow the deck cargo with due care.

## III.

### PROPER STOWAGE AND SEA-WORTHINESS

■ The manner in which the lumber, involved in this case was stowed is described in Findings of Fact Nos. 7–15. As I have found, placing fork-lift trucks on top of the lumber in the manner done here was a failure to exercise due care in stowage and rendered the Anthony II unseaworthy Finding of Fact No. 27. The only serious question of law with regard to negligence and unseaworthiness is whether the surveys and inspections made by Captain Newell and Arnold Moran, described in Finding of Fact 16, preclude findings of negligence and unseaworthiness.

■ Mere certificates and surveys are not sufficient to discharge a carrier's obligation for proper stowage since it cannot delegate this duty to others. See The Leerdam, 17 F.2d 586, 587 (5th Cir. 1927), where the court stated:

> "Due diligence to make the vessel seaworthy must in fact have been exercised. It is not sufficient for a shipowner to show that he had employed competent men to do the work, but he is held responsible for the failure of the men he employs [citing cases]."

See also Bank Line, Ltd. v. Porter, 25 F.2d 843, 845 (4th Cir.), cert. denied 278 U.S. 623, 49 S.Ct. 25, 73 L.Ed. 544 (1928).

■ The surveys and reports here are unimpressive and not controlling. See Huilever, S. A. Division Huileries Du Congo Belge v. The Otho, 139 F.2d 748 (2nd Cir.), cert. denied 322 U.S. 735, 64 S.Ct. 1047, 88 L.Ed. 1568 (1944) In fact, the testimony of Captain Newell is clear that he did not consider the fork-lift trucks. Furthermore, Moran's report does not even mention the fork-lift trucks.

It is fair to conclude that the reports of Captain Newell and Arnold Moran are not conclusive proof of seaworthiness or proper stowage under the law and do not preclude the findings that I have heretofore made.

## IV.

### DANGERS OR PERILS OF THE SEA

Both Anglo Canadian and Mardoro rely on Section 3 of the Harter Act, 46 U.S.C. § 192, and contend that the damage, if any, in this case arose from "dangers of the sea" for which they are not liable. Under Section 3 of the Harter Act, owners, charterers, agents and masters may not "be held liable for losses arising from dangers of the sea" if due diligence has been exercised to make the ship seaworthy. Here I have found that due diligence was not exercised, see Finding of Fact No. 27 and Point III in Discussion, so that neither Mardoro nor Anglo Canadian may avail itself of the limitations on liability contained in Section 3 of the Harter Act. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934). Moreover, even if due diligence were shown, the present case does not fall within the dangers of the sea exception.

■ The definition of dangers or perils of the sea is well settled. "Perils of the seas are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence." The Giulia, 218 F. 744, 746 (2nd Cir. 1914). A peril of the sea is "something so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety." The Rosalia, 264 F. 285, 288 (2nd Cir. 1920).

■ Although the weather here may have been stormy, this is insufficient to absolve respondents when this weather could have been anticipated, as Professor Donn testified. The Charlton Hall, 285 F. 640, 642 (S.D.N.Y.1922). " * * the weather must be irresistible, over-

whelming, and extraordinary for the particular time of year to be a good exception and not a common occurrence at that season of the year. The Orcadian (D.C.) 116 F. 930; The Rappahannock (C.C.A.) [2 Cir.] 184 F. 291; The Governor Powers (D.C.) 243 F. 961." The Manuel Arnus, 10 F.Supp. 729, 732 (S.D.N.Y.), aff'd 80 F.2d 1015 (2nd Cir. 1935). Such was not the case here.

The testimony, instead of showing that the deck cargo of lumber was lost by a peril of the sea, shows, rather, that the lumber was lost overboard by reason of improper stowage on deck. There was certainly no proof that the manner in which the lumber was stowed on deck did not contribute to its loss. In fact, the proof was to the contrary. There was no direct proof in this case to show that the custom or usage of the trade sanctioned placing fork-lift trucks on top of deck cargo. Cf. The Gualala, 178 F. 402, 406 (9th Cir. 1910) Such stowage was, in fact, not customary.

## V.

### ANGLO CANADIAN, MARDORO, AND THE ANTHONY II ARE LIABLE

Having determined that the libellants are entitled to recover, the next question is who is responsible for the loss to the libellants.

Respondent Anglo Canadian was the charterer of the Anthony II. Anglo Canadian's relationship to the cargo involved in this case is shown by its answer to interrogatory 7 propounded by libellant. Interrogatory 7 reads as follows:

"7. State whether or not respondent received the freight for the shipments in this libel and if so, whether such freight was kept by respondent or given to another party.

"(a) If given to another party, state the name of that party."

Answer to interrogatory 7:

"7. Anglo Canadian Shipping Co., Ltd. received freight for the shipment in this libel and all cargo carried by the vessel. From these freight monies Anglo Canadian Shipping Co. Ltd., as Charterers, were reimbursed for charter freight advances paid to vessel's owners, the Carrier, through Blidberg Rothschild, New York and in addition final charter hire payments owing to owners were similarly paid from Bill of Lading freights received. Likewise, the Stevedoring accounts at loading and discharging ports together with normal charterers' disbursements were all paid and recovered from Bill of Lading freights received."

Stevedores hired by Anglo Canadian loaded the lumber, lashed the deck cargo, and owned the fork-lift trucks. Moreover, the bills of lading contain the name "Anglo Canadian Shipping Company Limited, Vancouver, B. C." printed in good-sized type at the top of the bill, with the words "Bill of Lading" in larger type just below. These bills of lading were signed by the charterer "For and by Authority of Master." See Finding of Fact No. 6.

Under the above circumstances the charterer, Anglo Canadian, is liable. What Judge Hough stated in Gans S.S. Line v. Wilhelmsen, 275 F. 254, 262–263 (2nd Cir.), cert. denied 257 U.S. 655, 42 S.Ct. 97, 66 L.Ed. 419 (1921) is dispositive here:

"It is sufficiently shown in Judge Hand's opinion that by acceptance of cargo, the ship became liable in rem for due performance of the contract of affreightment. But when (Barber & Co.'s authority to sign for the master being undisputed) the master of a ship chartered but not demised, which was the condition of Themis, issues bills of lading, we hold that the contract evidenced thereby is not only the ship's contract, and that of the time or other charterer who caused their issue, but that of the owner, whose master (i. e., authorized agent) issued the same. Therefore in this instance the shippers had, beyond the obligation of the ship, the right to look to all three respondents, and hold any or all of them personally liable for right fulfillment of the bills. This point also

seems new in American courts, but it is well settled in Great Britain (Tillmans v. Knutsford, 13 Com.Cas. 244, 334; Manchester Trust v. Furness, 8 Asp. M.C., 57), where it is far more likely to be urged, owing to the weakness of maritime liens in the English admiralty."

See Pendleton v. Benner Line, 246 U.S. 353, 38 S.Ct. 330, 62 L.Ed. 770 (1918); Mente & Co. v. Isthmian S.S. Co., 36 F.Supp. 278, 283 (S.D.N.Y.1940), aff'd 122 F.2d 266 (2nd Cir. 1941). Nothing in the charter party affects this conclusion. The relationship between the charterer and the owner does not affect the charterer's liability to the shipper. See Pendleton v. Benner Line, supra. Finally, the "demise" clause is invalid and does not operate to exculpate Anglo Canadian. See Point II in Discussion.

The owner, Mardoro, and the ship, the Anthony II, are also liable to libellants for the loss involved in this case. Gans S.S. Line v. Wilhelmsen, supra; The Capitaine Faure, 10 F.2d 950 (2nd Cir.), cert. denied 271 U.S. 684, 46 S.Ct. 634, 70 L.Ed. 1150 (1926). Mardoro supplied the officers and crew of the Anthony II, and bills of lading were signed for the master. Moreover, the "demise" clause, while invalid to exculpate Anglo Canadian, explicitly makes the owner, Mardoro, liable for cargo damage.

I conclude, therefore, that libellants are entitled to judgment against Anglo Canadian, Mardoro, and the Anthony II.

## VI.

### LIABILITY OF RESPONDENTS AS BETWEEN EACH OTHER

Mardoro originally moved this court upon notice to Anglo Canadian to stay the determination of cross-claims pending arbitration in London. On January 24, 1966, with the consent of the parties, I deferred determination of that motion pending decision on libellants' claims. (See memorandum dated January 24, 1966) Subsequently, Mardoro withdrew its above-mentioned motion and requested a "complete determination" by the court. (See memorandum dated March 29, 1966) Later, at trial, I announced that the case would be submitted first solely on the claims of the libellants and that the determination of the cross-claims would be deferred until decision on the libellants' claims. I now direct respondents to submit and exchange appropriate proposed findings of fact and conclusions of law together with any additional memoranda on the cross-claims on or before August 15, 1966.

### CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter and the parties. 28 U.S.C. § 1333.

2. The Harter Act, 46 U.S.C. §§ 190–196, applies to this case.

3. Clause 6 and Clause 13 of the bills of lading are invalid under Section 1 of the Harter Act, 46 U.S.C. § 190, insofar as they purport to exculpate the carriers from liability for negligence in stowing the deck cargo.

4. The respondents were under a duty to stow the deck cargo properly and carefully and to exercise due diligence to make the vessel seaworthy at the commencement of the voyage.

5. The deck cargo was not properly and carefully stowed and due diligence was not exercised to make the Anthony II seaworthy.

6. Placing fork-lift trucks on top of the deck cargo in the manner described in Findings of Fact Nos. 11–12 rendered the Anthony II unseaworthy.

7. The weather conditions encountered by the Anthony II could have been anticipated and were not so overwhelming as to constitute a danger of the sea within the meaning of Section 3 of the Harter Act, 46 U.S.C. § 192.

8. Anglo Canadian was a carrier and is responsible for the cargo loss.

9. Mardoro was a carrier.

10. Anglo Canadian breached its contract of carriage by failing to stow the lumber properly and by failing to exercise due diligence to make the vessel seaworthy and is liable to libellants.

**870**

11. The Anthony II is liable in rem and Mardoro in personam for the failure to stow the deck cargo properly and the failure to exercise due diligence to make the vessel seaworthy.

12. Libellants are entitled to an interlocutory decree against Anglo Canadian, Mardoro, and the Anthony II. Entry of an appropriate decree, however, will be deferred until after a decision has been rendered as to the respective cross-claims of respondents since such decree may be affected by that determination. After deciding the cross-claims, the court will hear and determine damages, there being under the circumstances no apparent reason for appointment of a Commissioner.